TRUSTEES OF the TEAMSTERS CONSTRUCTION WORKERS LOCAL NO. 13, HEALTH AND WELFARE TRUST FUND FOR COLORADO, Trustee of the Colorado Teamsters Construction Workers Local No. 13, Vacation Fund, Trustees of the Construction Advancement Program, and Trustees of the Industry Advancement Program, Plaintiffs-Appellees,

v.

HAWG N ACTION, INC., a Colorado Corporation, Defendant-Appellant.

No. 79–1675.

United States Court of Appeals, Tenth Circuit.

Argued March 18, 1981.

Decided June 17, 1981.

Rehearing Denied Sept. 1, 1981.

Pamela M. Martin, Denver, Colo. (Eve M. Hernquist, Denver, Colo., with her on the brief), of Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for plaintiffs-appellees.

Glenn A. Bergmann, Denver, Colo., for defendant-appellant.

Before HOLLOWAY, McWILLIAMS and McKAY, Circuit Judges.

McWILLIAMS, Circuit Judge.

This is a civil action brought by the trustees of certain employer-union trust funds against Hawg N Action, Inc., a Colorado corporation. The claim is that the defendant, Hawg N Action, failed to make certain contributions into the several trust funds as required by a pre-hire agreement between it and the Colorado Teamsters Construction Workers Local No. 13.[1] Trial was to the court, and resulted in a judgment in favor of the trustees and against the defendant in the amount of $25,164.22 and costs. The defendant appeals.

The background facts are not in dispute. Prior to April 1977, John Lint and Ken Legried were engaged in excavation and earth work for residential and commercial construction. Both had many years of experience in this type of work. In April 1977, Lint and Legried formed a corporation known as Hawg N Action, which, as the name might suggest, was formed for the purpose of conducting such excavation and earth work. Lint served as president, and Legried as vice-president of the company.

The defendant owned but three pieces of equipment at the time of its incorporation, namely, a "low-boy" and an "end dump," and a tractor to pull them. The defendant needed only one truck driver, consequently, to operate its equipment. The defendant intended to hire, on an hourly basis, non-union "independent contract" haulers, who would furnish a truck and a driver for an agreed hourly rate, when it needed additional equipment. The defendant also proposed to subcontract some of its work.

Shortly after the defendant began its operations, Leroy Martin, a member of Local Union No. 13, who had known both Lint and Legried for some time, sought employment with the defendant company as a truck driver. Martin insisted from the outset that his union benefits be protected. Such would require that the defendant enter into a pre-hire collective bargaining agreement with Local No. 13. The defendant was desirous of employing Martin, and on behalf of the defendant, Lint and Legried agreed that the company would make all required contributions to the union's benefit funds resulting from Martin's employment. In this regard, Lint and Legried simply told Martin to contact the union and arrange for the necessary paperwork. It is not in dispute, and the District Court so

---

1. This action arises under Section 301 of the Labor-Management Relations Act (Taft-Hartley Act), 29 U.S.C. § 185 (1976).

found, that Lint and Legried only intended to pay contributions for Martin.[2]

Martin contacted union officials and advised them that the defendant desired a contract with the union. The union indicated it would have a business agent contact the defendant and negotiate an agreement. Lint and Legried, in turn, informed Martin, who was cast in the role of an intermediary, that they didn't need to see any business agent, and that all they wanted was a contract so that they could make the benefit payments to the union in order to protect Martin's rights. Martin did not advise the union officials of the reason for the defendant's request for a union contract. After several additional telephone calls between Martin and the union, the union sent the defendant a proposed contract, which was a copy of the then current 1975–1978 Teamsters Construction Workers Local Union No. 13, Highway, Heavy Engineering, Utility, and Building Construction Agreement.

The proposed contract was a comprehensive document, consisting of some 57 pages. Neither Lint nor Legried, however, read the proposed agreement with the union. Therein lies the root of the present controversy. After keeping the contract for about a week, Legried signed the contract and returned it to the union, assuming, as he testified, that it only covered Martin. The effective date of the contract was May 1, 1977, and, by its terms, it expired on May 1, 1978.

Thereafter, the defendant commenced to pay the contributions required as a result of Martin's employment. When the defendant later hired additional truck drivers, the defendant did recognize that these new employees were also covered by the agreement with the union and paid the benefit contributions required by their employment. In the meantime, the defendant continued to use "independent contract" haulers and subcontractors, and the defendant did *not* make any contributions in connection with their work. The trustees of the various trust funds later found out that the defendant had *not* been making contributions in connection with its use of independent contractors and subcontractors, and the present controversy arose.

As we understand it, there is no contention, in this Court, at least, that there never was a valid agreement between the union and the defendant, even though there was an obvious, and grievous, misunderstanding on the part of the defendant when its vice-president signed the contract submitted to it by the union. The mistake, however, was unilateral and solely the fault of the defendant. In this setting, then, the defendant's initial position is that the agreement itself does not require the contributions which the trustees claim.

### I. Subcontractors

As above indicated, the defendant performed some of its work through the use of subcontractors. Article 18 of the agreement between the defendant and the union relates to subcontractors and the pertinent parts thereof are set forth as Appendix "A." In essence, Article 18 provides that if the defendant subcontracts any of its work the subcontract shall provide that the subcontractor shall abide by all of the terms of the agreement between the defendant and the union. More specifically, paragraph 2 of Article 18 declares that any subcontract shall require the subcontractor to make payments to the various trust funds here involved.

█ It is undisputed that none of the subcontracts entered into by the defendant required the subcontractor to make payments to the employer-union trust funds. So, defendant's breach of its agreement with the union is well established. In such circumstance, the only remaining matter is the measure of damages. In this regard, it would appear that the trustees are entitled to damages in a sum equal to that which they would have received if the agreement

---

**2.** At trial, John Lint testified that at that time Martin was the only driver in Hawg N Action's employ, thereby precluding any confusion as to the employees covered by the agreement.

between the defendant and the union had been fully performed by all parties.[3]

The defendant argues that though it agreed to require any subcontractor to make payments into the trust funds, it did not agree to make such payments if the subcontractor failed to do so. In this manner, the defendant attempts to distinguish this case from *Walsh v. Schlecht*, 429 U.S. 401, 97 S.Ct. 679, 50 L.Ed.2d 641 (1977). We are not impressed with this attempted distinction. To accept this particular argument would mean that the trustees would have no remedy for defendant's undisputed breach of contract.

*Walsh v. Schlecht* deserves comment. In *Walsh* the collective-bargaining agreement provided that when an employer who was a signatory to the agreement subcontracted work he must either (1) require the subcontractor to be bound by the agreement or (2) be himself liable for payments to certain employer-union trust funds. The employer there involved did neither, and the trustees brought suit in the state courts of Oregon. The trustees prevailed, and the Supreme Court of Oregon affirmed on the issue of liability. On certiorari, the United States Supreme Court affirmed.[4]

The issue in *Walsh*, which is not present in the instant case, was whether the agreement required the employer to make payments "on behalf of" or "for the benefit of" the subcontractor's employees, or, on the other hand, simply required the employer to make contributions to the funds "meas-ured" by the hours worked by the subcontractor's employees. If the former, such would have violated Section 302(a)(1) of the Labor Management Relations (Taft-Hartley) Act (1947), 29 U.S.C. § 186(a)(1). The Supreme Court held, however, that such payments were simply measured by the hours worked by the subcontractor's employees and enforced the agreement there involved, notwithstanding the fact that the subcontractor's employees did not benefit from such payments and that such payments ultimately benefited only the employees of the employer and other signatory employers. So, in the instant case, the fact that the employees of the subcontractors will not benefit from the payments into the trust funds does not render the agreement unenforceable.

As indicated, we recognize that the bargaining agreement in *Walsh* did specifically provide that the signatory employer was liable if the subcontractor did not make the payments. If such a clause were in the instant agreement, it would appear that Hawg would have no defense. The absence of such a clause, however, in our view, is not fatal. The agreement did specifically provide that Hawg should *require* the subcontractor to sign an agreement with the Union to make payments into the various employer-union trust funds. Hawg breached this provision in the agreement, and is now simply called upon to respond in damages for its breach. The relevance of *Walsh* to the instant controversy is that Hawg may not avoid the agreement merely

---

**3.** The district court found that the plaintiffs were entitled to recover a total of $25,164.22 under the collective-bargaining agreement plus costs from the defendant. This sum is comprised of $15,856.33 in contributions to the trust funds, and additionally, $1,610.13 in liquidated damages; $697.76 in audit fees; and $7,000 in attorney's fees. The Supreme Court has stated that damages attributable solely to an employer's breach of contract should not be charged to the union. *Vaca v. Sipes*, 386 U.S. 171, 197, 87 S.Ct. 903, 920, 17 L.Ed.2d 842 (1967). This Court has held, more specifically, that in the collective bargaining context the compensatory damages for a breach should be such as will place the injured party in the same financial position in which he would have been had the contract not been breached. *International Br. of El. Wkrs. v. A–1 El. Serv.*, 535 F.2d 1, 3 (10th Cir.), *cert. denied*, 429 U.S. 832, 97 S.Ct. 94, 50 L.Ed.2d 96 (1976); *See also A To Z Rental, Inc. v. Wilson*, 413 F.2d 899, 908 (10th Cir. 1969).

**4.** The Supreme Court of Oregon did reverse the Circuit Court's opinion in part. The United States Supreme Court summarized this action in its affirming opinion as follows: "The Supreme Court of Oregon affirmed the judgment insofar as it sustained the demurrer to the petitioner's defense based on § 302(a)(1) but, construing the subcontractor's clause as giving all the 'funds ... equal standing under the terms of the contract ...,' reversed the judgment insofar as it limited the accounting to the Apprenticeship and CIAF trusts." 429 U.S. at 406, 97 S.Ct. at 684.

because the subcontractor's employees will not benefit by Hawg's payments measured by the hours worked by the subcontractor's employees. *See also Kreindler v. Clarise Sportswear Co.*, 184 F.Supp. 182, 184 (S.D. N.Y.1960).

## II. Independent Contractors

■ The defendant also performed part of its work by renting or leasing equipment which was operated by the lessor, or his employee. In an effort to escape liability under the agreement for work done by such owner-operators, defendant characterizes them as independent contractors.[5] Such characterization is not determinative of the problem.

Article 25 of the agreement between the defendant and the union, in pertinent part, is set forth as Appendix "B." It provides that when the defendant rents or leases from one owner not more than two units of equipment, fully manned and operated, the defendant shall pay all applicable contributions to the trust funds referred to in the agreement on a straight time basis for all hours worked by such driver.

It is undisputed that defendant performed a part of its work by renting or leasing fully manned equipment, and that it did not make the payments called for by Article 25. In this regard, then, the breach of contract and resulting damage were clearly established.[6]

## III. Repudiation, Laches, and Estoppel

■ It would appear that the defendant made trust fund payments covering Martin's employment, and that of additional employees whom defendant later hired, for several months, and then stopped making further payments. Based on this, the defendant in this Court argues that the defendant repudiated the agreement, and that the trustees are barred from recovery on the basis of estoppel and laches.[7] As far as we can ascertain, none of these matters was ever raised in the trial court. Such were not pled by the defendant in its answer, and were not contained in the pretrial order. Nor can we find that the issues were tried with consent of the parties. For example, counsel, by way of closing argument to the trial court, did not present these matters to the trial court for resolution. And the trial court did not make findings or conclusions on these issues. Such being the case, we are not going to come to grips with these questions for the first time on appeal. Generally speaking, an appellate court will not consider on appeal issues never raised in the trial court. *Neu v. Grant*, 548 F.2d 281, 287 (10th Cir. 1977). By thus disposing of the defendant's claim of repudiation, estoppel and laches, we do not wish to be understood as in any way indicating that any of these matters has real merit. In our view, they do not.

Judgment affirmed.

## APPENDIX "A"

### ARTICLE 18

### SUBCONTRACTORS

1. In order to protect the wages, working conditions and job opportunities of workmen employed under this Agreement, it is agreed that if the Contractor subcontracts any work on any construction project covered by this Agreement, such subcontract shall provide that the Subcontractor

---

5. The defendant described such "independent contract haulers" at trial and in its brief as separate and distinct business entities who work for a variety of customers of their own choosing, pay their own expenses, own their own equipment and maintain separate accounts.

6. In regard to the breach of the agreement under both Article 18 and Article 25, we note that Article 28, which provides for Trust Fund Delinquencies, states that each failure to file a monthly report of work hours and each failure to timely pay monthly contributions constitutes a separate and distinct violation of the Trust Agreement for which the union is entitled to damages and costs.

7. Specifically, the defendant claims that assuming *arguendo* that it was obliged to make the contributions to the trust funds, it repudiated the contract by failing to make such payments and the lack of receipt thereof by the union constituted sufficient notice of Hawg N Action's repudiation. Additionally, the defendant argues that the union should be barred from bringing this action on the ground of laches because Hawg N Action ceased paying contributions in July, 1977, but the union did not request an audit until April, 1978.

shall abide by all of the terms of this Agreement in performing such work for the duration thereof.

2. The subcontract shall further require the Subcontractor to sign an Agreement with the Union requiring the Subcontractor to make payments to the Health and Welfare Fund, the Pension Fund, the Vacation Fund and the Industry Funds referred to in Articles 26 and 27 of this Agreement. Such payments shall be made only for work performed on the particular project by the Subcontractor's Employees. Such payments shall be made to the same Trusts, in the same amounts, and upon the same terms and conditions as required of the Contractor under this Agreement.

APPENDIX "B"

ARTICLE 25

TRUCK RENTAL CONDITIONS

1. When a Contractor rents or leases from one Owner not more than two units of equipment, fully manned and operated, of a type used for highway, heavy engineering, utility or building construction work covered by this Agreement, the following shall apply:

\* \* \* \* \* \*

(d) The Contractor shall pay all applicable contributions to the respective fringe benefit and industry fund trusts referred to in this Agreement on a straight time basis for all hours worked by such drivers.